IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 1, 2018

### IN RE: MIKKO B.[1]

**Appeal from the Chancery Court for Knox County**
**No. 192363-2          Clarence E. Pridemore, Jr., Chancellor**

_____

**No. E2018-00521-COA-R3-PT**

_____

A mother and her husband petitioned the court to terminate the biological father's parental rights to his son on the grounds of abandonment by failure to visit and failure to support. After a trial, the court terminated Father's rights on those grounds and upon its holding that termination of Father's rights would be in the best interest of the child. Father appeals. Upon our review, we affirm the judgment in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KENNY W. ARMSTRONG, J., joined.

Edith A. Brady, Sevierville, Tennessee, for the appellant, Damian B.

Mital D. Patel, Knoxville, Tennessee, for the appellees, Ronald K. and Kelli K.

**OPINION**

## I. FACTUAL AND PROCEDURAL HISTORY

Mikko B. ("Child") was born to Kelli C. ("Mother") and Damian B. ("Father") in December 2009 in Asheville, North Carolina.[2] Mother, Father, and Mikko lived together in North Carolina until 2012, when Mother relocated to Knoxville, Tennessee, with Mikko.

_____

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

[2] Kelli C. married in July 2016; she is now Kelli K.

In 2013, Mother initiated proceedings in the Juvenile Court of Knox County to establish Father's parentage of Mikko and to set a parenting plan and child support. An order was entered on June 20, 2013, stating that "[t]he parties agree that the Father of the subject child is Damian [B.]. The agreed parenting plan designates Mother as the primary residential parent and awards Father 84 days of parenting time per year, to be exercised every other weekend. Father's monthly child support obligation was set at $355.00.[3]

In April 2016, Mother filed an "Emergency Petition for Custody or in the alternative Emergency Petition for Modification" alleging *inter alia* that Father "was bringing the Minor Child to stay the weekend with him in a home from which he was selling illegal drugs"; that Father had been charged in September 2015 with Felony Trafficking in Marijuana, Felony Possession of Schedule VI Controlled Substance, Felony Maintaining a Dwelling for Keeping and Selling Controlled Substances, and Misdemeanor Possession of Marijuana Paraphernalia; and that Father did not notify Mother of the charges. An Expedited Order Directing Agency Supervised Visitation was entered on May 5, 2016, ordering that Father's visitation be supervised, and that it take place at "Parent Place" in Knoxville based upon the availability of the facility and the finances of the parties.

In July 2016, Mother married Ronald K., ("Step-father"); the couple had previously had a son in May 2016. On September 15, Mother and Step-father filed the instant petition in Knox County Chancery Court, seeking to terminate Father's parental rights and for step-parent adoption. As grounds for termination, the petition alleged that Father had abandoned Mikko by willfully failing to visit and support him; the petition also alleged that termination of Father's rights was in Mikko's best interest.[4]

---

[3] The parties both testified that they attempted to mediate a new parenting plan in October 2015 due to Father's desire to have more time with Mikko and Father's decision to establish a residence in Knoxville. There is no order adopting a subsequent plan in the record.

[4] The petition also alleges the following:

> 16. Mother avers that father has extensive involvement in the trafficking of controlled substances, i.e. the drug trade, exposing the minor child to dangerous situations and persons and that father's persistence of conditions (i.e. his continued involvement in these illegal activities) constitutes a wanton disregard for the child's welfare.
> 17. Accordingly, Petitioners aver that placing custody of the child in the Respondent's legal and physical custody will pose a risk of substantial harm to the physical and/or psychological welfare of the minor child as such is defined under Tennessee law, specifically Tennessee Code Annotated §§37-1-113 (7) [sic] and §§37-1-113[g](9)(A)(iv) and (v) (2014).

The trial court made no findings with regard to these grounds, and no issue is raised with respect to them on appeal. The grounds are inapplicable to the facts of this case, inasmuch as there is no proof that Mikko

Father answered the petition, and the court appointed a guardian *ad litem*. The case proceeded to trial on November 17, 2017, and January 23 and February 6, 2018; eight witnesses testified. An order terminating Father's parental rights was entered on March 1, terminating Father's rights on the grounds of abandonment by willful failure to pay support, abandonment by willful failure to visit, and upon its conclusion that termination of Father's rights would be in Mikko's best interest.

Father appeals, stating the following issues:

I. The Trial Court erred in finding that the Petitioners had proven that grounds existed to terminate the father's parental rights by clear and convincing evidence.
    a. The proof does not show abandonment by failure to provide support by clear and convincing evidence.
    b. The proof does not show abandonment by failure to visit by clear and convincing evidence.

II. The Trial Court erred in using a preponderance of the evidence standard as opposed to the clear and convincing evidence standard when analyzing whether a termination of Father's parental rights would be in the child's best interest. Further, even if analyzed using a clear and convincing evidence standard, the facts set forth by the Court would not justify a finding that it was in the child's best interest for Father's parental rights to be terminated.

## II. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Serv. v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

---

was removed from Father's custody by court order (section 36-1-113(g)(3)(A)), or that Father was incarcerated during a part of the four months preceding the filing of the petition (sections 36-1-113(g)(1) and -102(1)(a)(iv)).

3

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

## III. ANALYSIS

### A. Whether Clear and Convincing Evidence Supported the Grounds of Abandonment by Failure to Visit and Failure to Support

Abandonment is identified as a ground for termination in Tennessee Code Annotated section 36-1-116(g)(1) and defined in section 36-1-102(1)(A), which reads in pertinent part:

> For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

> > (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A) (2016). In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court discussed willfulness in the context of termination cases:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months. . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing. . . . Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child. The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially.
>
> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* at 863-64 (citations and footnotes omitted).

### 1. Failure to Support

The trial court held that Father willfully failed to support Mikko in the four months preceding the filing of the petition.[5] The pertinent portion of the order reads:

---

[5] The petition was filed on September 15, 2106; consequently, the pertinent period is May 14 to September 14.

By clear and convincing evidence, pursuant to Tennessee Code Annotated §36-1-113 and §36-1-102; it is clear to this court that:

> a. there is a grounds for Termination of Parental Rights based on abandonment due to a parent willfully failing to make reasonable payments toward the support of the child because the father willfully failed to support the minor child by failing to pay child support of any kind, except for the token amount of $100.00 during the four (4) month relevant period of time and a total of $165.00 from October 2016 until the present date. The court find[s] this to be token support.[6]

Father does not challenge the finding that he did not pay support, other than $100, during the period, and the testimony of Father and Mother supports the finding. We thus turn to a consideration of Father's arguments that his failure to support Mikko was not willful.

Father concedes that he was aware of his duty to pay support; he asserts that his failure to pay support was not willful and that this ground was not proven as "there is only confusing evidence as to the amount [of his income]"; that he did not have enough income to meet his expenses; that "minimal evidence was submitted as to what Father's actual expenses were during the requisite time"; and that he "had been charged with criminal activities that resulted in his reduced ability to obtain employment." Father also argues that "[w]hen Mother chose to leave [North Carolina] with the minor child, Father did not continue his pursuit for higher education … [and] lost the money associated with scholarships, grants and student loans." In support of his argument, Father cites his testimony that his driver's "license is suspended right now"[7]; that he pled guilty in May 2016 to the felony of manufacturing marijuana; and that he makes $13,000 per year from the business that does "automotive customizations and general service" that he has owned

---

[6] Tennessee Code Annotated section 36-1-102(1)(B) defines "token support" as "support [that], under the circumstances of the individual case, is insignificant given the parent's means."

[7] Father's explanation for his license being suspended was as follows:

> Q You just testified -- when was the last time you had a valid license? Did you tell me that?
> A I don't know exactly the date was that it was -- my North Carolina driver's license was valid until I went to go have it reinstated and there was a hold on it from Tennessee. So I had to pay a fee to them, which I did, to get it reinstated and then they said that I wouldn't be able to go through until I had it taken care of here, at which time Ms. Wilford[, Father's attorney,] had filed a motion. This was when the child support modifications was supposed to be to allow for arrears to be paid and my license to be reinstated, so I'm sorry, I don't remember exactly the date.

6

for three and a half years. In addition to his testimony, the record contains an unsigned affidavit prepared by Father and attached as an exhibit to his discovery responses setting forth his income and expenses,[8] and a signed affidavit of indigency filed in the case under penalty of perjury. As we review the evidence and Father's arguments, we are mindful of the court's adverse credibility determination:

> The Court would further state that it found most of the testimony to be credible with the exception of [Father] who the Court found to woefully lack credibility, that [Father] testified over the course of two days and wove a series of lies and deceit that this Court can barely make heads or tails out of.

Father's unsigned affidavit states that his net monthly income from his automotive repair business is approximately $2,065.40; in the affidavit of indigency, however, Father states that he made $13,000 per year; he also testified that he netted "maybe [$]27[,000]" in 2017. Father also testified that he earned income giving tours of Asheville architecture, doing work for friend, working for Elf Racing, and from rent received from tenants living in his home. With respect to his expenses, the unsigned affidavit shows total monthly expenses, including child support, of $4,245. Despite his assertion that he does not drive since he has a suspended license, the unsigned affidavit reports that he spends $350.00 per month in gas and vehicle maintenance; the affidavit also states that he spends $250 per month on "entertainment" which he specifies as "restaurants, movies, child activities, etc." Father also testified that he has legal expenses relating to his criminal charges and this termination proceeding; that he borrowed money from "mostly friends" and family to pay for his attorneys; and that he hired an attorney for his criminal charges rather than pay child support.[9] While Father contends in his brief that he "filed to modify his child

---

[8] The interrogatory responses and affidavit were introduced in the course of the cross-examination of Father and admitted over his objection; the court held that the documents went to Father's credibility.

[9] Father acknowledged that he had the ability to pay in the following testimony:

> Q  You had the ability to pay. Will you agree with me that you had the ability to pay $355 a month to child support?
> A  Given that decision, correct.
> Q  That you did have the ability to pay?
> A  Correct.
>     THE COURT:  So you're saying that you had the ability to pay but you chose to spend the money on an attorney instead of child support?
>     THE WITNESS:  That's correct.
> ***
> Q  You realize it is very important to pay your child support?
> A  Yes.
> Q  But you were not willfully not paying
> A  Yeah.
> Q  -- true?

support," there is no motion in the record before us, and the only proof in the record to which we are cited in support of this contention is testimony that is not clear.[10]

The record contains clear and convincing evidence that Father knew of his duty to support, was capable of working and earning money; that he has held numerous jobs and owns his own company; that he did not pay support during the relevant time period; and that he had no justifiable excuse for failing to pay support. The evidence establishes that Father abandoned Mikko by willfully failing to support him, and we affirm the trial court's holding that this ground was established by clear and convincing evidence.

### 2. Failure to Visit

The court's conclusion regarding Father's willful failure to visit is as follows:

> By clear and convincing evidence, pursuant to Tennessee Code Annotated §36-1-113 and §36-1-102; it is clear to this court that: . . .
> b. there is a grounds for Termination of Parental Rights based on abandonment due to a parent willfully failing to visit. That the Juvenile Court ordered visitation at Parent Place [on] May 5, 2016, and the father only made two token visitations between May 5, 2016 and September 15, 2016. Father made excuses that he did not know how to request more visitation, but the Court finds that he had hired attorneys privately for his criminal matters and was represented by Ms. Metcalf in 2015, when he requested the Court to modify the 2013 Parenting Plan and when he entered into a mediated Parenting Plan in October, 2015. Thus, [Father] is well aware of how attorneys operate.

The parenting plan entered in the Juvenile Court in June of 2013 provided that Father would have unsupervised visitation with Mikko on alternate weekends; as noted earlier in this opinion, on May 5, 2016, the Juvenile Court entered an order requiring Father's visitation be supervised and take place at Parent Place in Knoxville. The visitation records from Parent Place show that Father visited Mikko on two occasions in the four months preceding the filing of the petition, August 31 and September 14. In his

---

A Correct.

[10] Father cites to his following testimony:

> . . . there was a hold on [my North Carolina driver's license] from Tennessee. So I had to pay a fee to [North Carolina], which I did, to get it reinstated and then they said that I wouldn't be able to go through until I had it taken care of here, at which time Ms. Wilford[, Father's attorney,] had filed a motion. This was when the child support modifications was supposed to be to allow for arrears to be paid and my license to be reinstated.

brief on appeal, Father contends that he was unable to visit Mikko between May and August because Mother interfered with his visitation by not working with Parent Place to set up visitation.

Father testified as follows with respect to his efforts to secure visitation through Parent Place:

Q. So you were not represented in May of 2016 when the first order went down saying you get supervised visitation?
A. No, I was not.
Q. Okay. So in May when the order went down you had three months over the summer, three months, to hire an attorney to do something to get before the court to get some time with your son. What did you do?
A. I filed with Parent Place. I didn't know that I was going to need an attorney to do that. I filed paperwork immediately, maybe the second day, after I received two -- maybe second or third – second day after I received the notification of the emergency custody I filed with Parent Place.[11] I supplied them with my availability, which was completely open. And they said that they were waiting on the other party to submit their availability, which that was – I'm not an attorney, that's -- I never dealt with this before, that's all I knew to do.

* * *

Q. So a couple of weeks after you were given supervised visitation at Parent Place and you realized, goodness, I still haven't seen my son, it's been three weeks or it's been four weeks, maybe it's been five weeks, I still haven't seen my son, you didn't think at that point it's time to get an attorney?
A. I didn't no. No. I didn't know there was any -- as far as I knew, I did everything I could. I filed the paperwork. I would call Parent Place, ask if there had been any change. Kind of hard to get through on the telephone sometimes, but when I would speak to anybody, they said they still hadn't received the – Kelli's availability.
Q. Did you call every single day --
A. Not --
Q. -- for three months?
A. No, because I -- I didn't call every single day.
Q. Would you have called every other day?
A. Every few days, probably. I didn't want to -- in my

_____

[11] Father's testimony is contradicted by that of Mandy Davis from Parent Place, who testified that Father completed an intake on June 14, 2016.

9

experience it seems like if you badger somebody, they're going to be less likely to do things sometimes.

Mother testified that Mikko had been diagnosed with autism spectrum disorder, as a result of which he requires a structured environment and regimented schedule, including school attendance, a weekly counseling session, and a consistent bedtime. Mother testified that when she was contacted by Parent Place, she completed the necessary paperwork within one or two days; that she sought a two hour time period from 4:00 to 6:00 p.m. for visitation in order to accommodate Mikko's schedule, but the time slots that were available, from 2:00 to 4:00 p.m. and 6:00 to 8:00 p.m., conflicted with Mikko's schedule. She also testified that when a 4 p.m. to 6 p.m. time slot became available, she was willing to make Mikko available. Mother testified that the Parent Place representative told her she would contact Mother when an earlier time slot became available, but Mother did not hear back from Parent Place. Mother testified that the guardian *ad litem* contacted Parent Place in August and set up one hour visits until a two hour time slot became available, and that she made Mikko available for those one-hour visits.

From our review of the record, we discern no actions on the part of Mother that amount to a restraint of or interference with Father's efforts to exercise visitation with Mikko. To the contrary, Father took no action to exercise his visitation after completing the paperwork required by Parent Place and making calls to determine when the visitation would take place; as noted by the trial court, Father did not attempt to engage counsel or otherwise seek to enforce the Juvenile Court order giving him visitation or alternative means to exercise visitation. Again mindful of the adverse determination made by the trial judge regarding Father's credibility, the evidence clearly shows that Mother did not interfere with Father's visitation and that his failure to visit was willful within the meaning of section 36-1-102.

## B. Best Interest

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the child's best interest.[12] The list of factors in the statute "is not exhaustive, and the statute

---

[12] The factors at Tennessee Code Annotated section 36-1-113(i) are:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)). As we consider this issue we are also mindful of the following instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

As an initial matter, we address Father's contention that the trial court used the preponderance of the evidence standard, rather than the clear and convincing evidence standard in determining that termination of his parental rights was in Mikko's best interest. He premises his argument on the court's reference to the preponderance of the

---

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

evidence standard in the concluding paragraph, quoted above.[13]  We disagree with his contention.

The Tennessee Supreme Court has instructed that the facts relating to the factors of the best-interest analysis are to be proven by a preponderance of the evidence, not by clear and convincing evidence, and once those factual findings are made, the trial court is then to consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest. *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015).  In the order terminating Father's rights, after making findings largely related to the procedural history of the case, the court states that its conclusions are made "by clear and convincing evidence, pursuant to Tennessee Code Annotated § 36-1-113 and § 36-1-102."  In our review of the order in its entirety, it is apparent that the court employed the clear and convincing standard as to both the grounds for termination and best interest; taken in context, the reference to the preponderance standard in the concluding paragraph is mistaken language rather than a statement of the nature of the court's best interest analysis.  Accordingly, we proceed to review the best interest determination.

The court held that termination of Father's parental rights would be in the best interest of Mikko, stating:

> By clear and convincing evidence, pursuant to Tennessee Code Annotated §36-1-113 and §36-1-102; it is clear to this court that:
> ***
> c. As to the best interest analysis of Tennessee Code Annotated §36-1-113, the Court finds as follows:
> i. The first factor is whether the parent or guardian has made such an adjustment of circumstances, conduct or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian. It is clear to the Court that [Father] has never really made any adjustments. The Court still has doubts as to whether he is still growing marijuana. He still has a lifestyle he is supporting somehow on $12,000.00 a year. The Court does not believe he took responsibility for his marijuana growing operation and does not believe he made any adjustments necessary. Therefore, the Court finds that this factor also weighs in favor of the best interest of the child is to terminate [Father]'s parental rights.
> ii. The second factor is whether the parent or guardian has failed to effect the lasting adjustment after reasonable efforts by social

---

[13] Father also asserts that the court relied upon the preponderance standard in its oral ruling, but as that ruling is not expressly incorporated into the court's order, we do not consider it. "Tennessee law is clear that the trial court speaks through its written orders, not the transcript." *In re Navada N.*, 498 S.W.3d 579, 594 (Tenn. Ct. App. 2016) (citing *Williams v. City of Burns*, 465 S.W.3d 96, 119 (Tenn. 2015)).

services. This factor is irrelevant to this case. DCS has not been involved in this matter or with these parties.

iii. The third factor is whether the parent or guardian has maintained regular visitation or other contact with the child. Since May 2016, the only contact that [Father] has had with the child are these token visitations at Parent Place, which the Court does not consider that it constitutes regular visitation such that it would be in the best interest of the child to continue. Therefore, the Court finds that this factor also weighs in favor of the best interest of the child is to terminate [Father]'s parental rights.

iv. The fourth factor is whether a meaningful relationship has otherwise been established between the parents or guardian and the child. Relying upon the testimony of the expert witness in this case, Nan Butruff, LCSW, who has been treating the minor child, the Court finds that no meaningful relationship has been established between [Father] and the minor child. Therefore, the Court finds that this factor also weighs in favor of the best interest of the child is to terminate [Father]'s parental rights.

v. The fifth factor is the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition. Mikko has some medical conditions such that it would be in the child's best interest to have stability with someone that is there on a full-time basis and not someone that has token visitation and someone that does not want to take responsibility for his actions. Therefore, the Court finds that this factor also weighs in favor of the best interest of the child is to terminate [Father]'s parental rights.

vi. The sixth factor is whether the parent or guardian or other person residing with the parent or guardian has shown brutality, physical, sexual, emotion[al,] or psychological abuse or neglect towards the child or another child or adult in the family or household. It is clear to this Court there has been both physical and psychological abuse to [Mother] when she was living with [Father]. The Court heard of numerous instances of physical abuse, [Father] putting a gun to [Mother]'s eyeball, verbal abuse, [Father] putting his hands on her neck trying to choke her, throwing her to the floor over this issue about her commenting about his sister passing away or committing suicide. All these are inexcusable, both psychological and physical and emotion[al] abuse. Therefore, the Court finds that this factor also weighs in favor of the best interest of the child is to terminate [Father]'s parental rights.

vii. The seventh factor is whether the physical environment of the parents or guardians home is healthy and safe, whether there is criminal activity in the home or whether there is such use of alcohol, controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner. The Court has great concerns

13

regarding [Father]'s testimony and whether or not he is still growing marijuana or conducting a drug dealing operation from his home. Therefore, the Court finds that this factor also weighs in favor of the best interest of the child is to terminate [Father]'s parental rights.

viii. The eighth factor is whether the parents or guardians mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child. There is no question from the testimony that [Father] had some kind of unstable emotional issues regarding violence and abuse to both, [Mother] and some previous lady, because there was an agreed order of protection taken out in 1999. The Court believes it would be unsafe for the minor child to return to [Father] based on his domestic violence and his mental instability regarding violent outbursts. Therefore, the Court finds that this factor also weighs in favor of the best interest of the child is to terminate [Father]'s parental rights.

ix. The ninth factor is whether the parent or guardian has paid child support consistent with the child support consistent with the child support guidelines promulgated by the Department pursuant to Tennessee Code Annotated §36-5-101, and the Court finds that it has been almost 28 months since October, 2015, since [Father] has paid any child support absent token payments of $165.00 (only $100.00 of which was during the relevant four month period of time immediately preceding the filing of the Petition in this cause). Therefore, the Court finds that this factor also weighs in favor of the best interest of the child is to terminate [Father]'s parental rights.

IT IS THEREFORE ORDERED, that by clear and convincing evidence there are grounds for both abandonment by willful failure to support and by willful failure to visit and that it is in the best interest of the child by a preponderance of the evidence pursuant to Tennessee Code Annotated §36-1-113 to have the respondent, [Father]'s, rights terminated.

The record, specifically the testimony of Mother, Father and Ms. Nan Butruff, a licensed clinical social worker who is employed as a therapist at Behavioral Strategies and has been Mikko's therapist since May of 2106, provides clear and convincing evidence in support of the court's factual findings. We have reviewed the findings in light of the testimony cited by Father in his brief on appeal that he contends was not considered by the court and his argument as to the weight the court afforded all the testimony, the testimony cited by Mother in response, and the entire record, and conclude that the evidence cited by Father does not preponderate against the court's findings. Further, the record establishes that Mother and Step-father have provided a safe and stable home wherein Mikko's need for a structured environment is being met. Upon our

14

review, the combined weight of the factual findings is clear and convincing evidence that termination of Father's parental rights is in Mikko's best interest.

## IV. CONCLUSION

For the foregoing reasons, we affirm the termination of Father's parental rights to Mikko.

_____
RICHARD H. DINKINS, JUDGE